UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JARED T. GREINER, as Personal
Representative of the Estate of
GARY GREINER, deceased,

        Plaintiff,                                    Hon. Janet T. Neff

v.                                                    Case No. 1:19-cv-936

OCEANA COUNTY, et al.,

        Defendants.
_____/

**REPORT AND RECOMMENDATION**

Plaintiff Jared T. Greiner, the Personal Representative of the Estate of Gary Greiner, deceased, filed a complaint pursuant to 42 U.S.C. § 1983 against the County of Oceana and several County officials, alleging that they violated his constitutional rights under the Eighth and Fourteenth Amendments in connection with Gary Greiner's suicidal actions while housed at the Oceana County Jail on November 5, 2018, that resulted in his eventual death on November 16, 2018. Following initial screening pursuant to 28 U.S.C. § 1915A; 42 U.S.C.§ 1997e(c), Plaintiff's remaining claims are for deliberate indifference against Defendants Brad Fritcher and Treven Padilla under the Fourteenth Amendment.

This matter is presently before me for consideration of Defendants' Motion for Summary Judgment. (ECF No. 28.) Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the motion be **GRANTED**.[1]

---

[1] The Court denies the parties' requests for oral argument because the issues are adequately briefed, and oral argument would not further assist the Court in reaching a decision.

## I. Background

### A. Gary Greiner's Arrest

On November 3, 2018, at approximately 9:00 a.m., Plaintiff's decedent, Gary Greiner, arrived at the home of his ex-wife, Michelle Slocum, in Hart, Michigan, on a tractor that he had borrowed from his employer. (ECF No. 29-2 at PageID.175; EFC No. 29-3 at PageID.226.) At the time, Greiner was intoxicated and was looking for a man he believed was romantically involved with Slocum. (ECF No. 29-2 at PageID.181.) Greiner was carrying a hunting knife and forced his way into the home when Slocum opened the door. When Slocum told Greiner that the man was not there, he began waiving the knife around and threw it at the floor near Slocum. She grabbed the knife and sat down, and Greiner took her cell phone and broke it. Greiner and Slocum then had a brief conversation, during which Greiner told Slocum that he was going to flip her car. Greiner subsequently left the home, used the bucket/front-end loader on the tractor to flip Slocum's car, and left the scene. (*Id.* at PageID.181–82.)

Slocum called the police a few hours later, after she obtained a new cell phone, and reported the details of the incident. (*Id.* at PageID.183.) The Oceana County Sheriff's Office dispatched Deputy John Fraass to the scene. Deputy Jeffrey Brown arrived shortly thereafter. (ECF No. 29-3 at PageID.198; ECF No.29-4 at PageID.212.) Slocum explained to Deputy Fraass what had occurred, including that Greiner was intoxicated, and told him that Greiner was working nearby at the Jensen farm and had been staying at a small house next to the farm property. She also indicated that Greiner likely obtained the tractor from the farm. (ECF No. 29-4 at PageID.212.)

Deputies Fraass and Brown left and went to the Jensen farm property, where they spoke to James Jensen, a part-owner of the farm. Jensen said that he had not seen Greiner and that he was off for the weekend. While speaking with Jensen, the deputies saw a tractor that matched the description of the tractor Slocum had provided. When the deputies asked Jensen where Greiner

was staying, Jensen said that Greiner intended to purchase an older farmhouse on the east side of the farm that Jensen was remodeling, but he was not living there at the time. Because Jensen's information conflicted with what Slocum had provided, the deputies obtained Jensen's permission to go to the house to look for Greiner. (*Id.*; ECF No. 29-5 at PageID.227.)

When Deputy Fraass arrived at the farmhouse, he saw a man inside matching Greiner's description drop to the floor out of sight. Deputy Brown arrived shortly thereafter, and they called for backup from other law enforcement agencies. The deputies knocked on the doors and windows while yelling to Greiner to come out, and even used the loudspeaker on a patrol vehicle, but he refused to leave the residence. (ECF No. 29-3 at PagID.199; ECF No. 29-4 at PageID.212.) When the backup officers arrived, the deputies decided to enter the residence. They first swept the upstairs and, finding no sign of Greiner, went to search the dark basement. As they reached the bottom of the stairs and turned a corner, Deputy Brown, who was the first officer, saw Greiner pointing a loaded crossbow directly at him. (ECF No. 29-3 at PageID.200–01; ECF No. 29-4 at PageID.213.) The deputies instructed Greiner to drop the crossbow but retreated up the stairs when he refused to do so. Once outside, Deputy Brown yelled to Greiner to come out. Greiner responded that the deputies should come back down so that he could shoot them, and they could shoot him. He also said that someone was going to die that day. (ECF No. 29-3 at PageID.202.)

After speaking with a Michigan State Police negotiator for a few hours, Greiner finally emerged from the basement and surrendered. (*Id.*) Greiner was transported to the Oceana County Jail (OCJ) by Lt. Hasty. (*Id.* at PageID.203.)

### B.    Greiner Is Booked into the Oceana County Jail

Greiner was brought to the jail at approximately 5:00 p.m. on November 3. (ECF No. 29-7 at PageID.252.) Defendants Brad Fritcher and Treven Padilla, who work the day shift from 6:00 a.m. to 6:00 p.m. as corrections officers, were present when Greiner arrived. (*Id.* at PageID.251–

52; ECF No. 29-8 at PageID.268.) Defendant Fritcher did not speak with Lt. Hasty regarding Greiner, but began to fill out the intake form with the information that he had available. (ECF No. 29-8 at PageID.269.) Deputy Fraass, as the officer in charge, completed the remainder of the intake form later that evening. (ECF No. 29-4 at PageID.214–15.) Deputy Fraass noted on the form that Greiner had exhibited suicidal behavior. (*Id.* at PageID.215; ECF No. 29-9.)

Because Greiner was intoxicated when he was brought into the jail, he was placed in a holding cell, and his booking was delayed several hours, until approximately 10:30 p.m. Deputy Jordan Young handled the booking and completed a medical assessment. (ECF No. 29-11 at PageID.300; ECF No. 29-13.) Young noted that Greiner was under the influence of alcohol and had a history of anxiety and depression. (ECF No. 29-13 at PageID.327.) Greiner reported that he had been hospitalized at Hackley Hospital for psychiatric treatment about a month before. He also reported that he had never contemplated or attempted suicide, but he said that he was presently contemplating suicide. Young noted that the behavior he observed did not suggest a risk of suicide. (*Id.* at PageID.328.) However, Young immediately placed Greiner on suicide watch. (ECF No. 29-11 at PageID.301.) A prisoner on suicide watch at OCJ is placed in a suicide gown, housed in a separate cell, observed every fifteen minutes, and scheduled for a mental health examination through community mental health. (ECF No. 29-7 at PageID.249.)

Deputy Young continued the suicide watch until the end of his shift at 6:00 a.m. on November 4. (ECF No. 29-14 at PageID.331–32.) In addition, he contacted West Michigan Community Mental Health (WMCMH) before his shift ended. Teddy Dawson, LLP, the "on call" provider with WMCMH at the time, received the information and contacted OCJ to see what they needed him to do. He was advised to come later in the day to allow Greiner time to sleep. (ECF No. 29-17 at PageID.366, 369.)

4

C. **Dawson Evaluates Greiner**

Defendants Padilla and Fritcher returned for their next shift the morning of November 4 at 6:00 a.m. When they arrived at the jail, they were informed that Greiner was on suicide watch. (ECF No. 29-7 at PageID.252–53; ECF No. 29-8 at PageID.269.) Defendant Fritcher maintained a suicide watch log and kept Greiner on suicide watch while they waited for Dawson to evaluate Greiner. (ECF No. 29-14 at PageID.331–32.)

Dawson arrived at the jail around 1:25 p.m. and met with Griner for about 20 minutes. (ECF No. 29-17 at PageID.369.) Dawson asked Greiner about his mental status, whether he had any thoughts about harming himself or wanting to die, and why he was in jail. (*Id.* at PageID.370.) Dawson observed that Greiner's appearance was not different from that of any other inmate he had visited in confinement and that, while Greiner was sad, he was not in distress. He also found that Greiner was "negative" for a depression assessment. (*Id.* at PageID.371, 374.) Dawson evaluated Greiner for suicide risk, including current suicidal ideation and plans and history of suicide attempts and plans. Based on Greiner's responses, Dawson answered "no" to these questions. (*Id.* at PageID.373.) Greiner did disclose that he had thoughts of hanging himself about 20 years ago, but Dawson concluded that Greiner had no current plan to commit suicide. (*Id.* at PageID.373–74.)

Dawson concluded that Greiner's answers and his score on the Columbia Suicide Scale indicated that he was not at risk of suicide and could be taken off suicide watch. (*Id.* at PageID.374, 376–78.) Defendant Fritcher twice asked Dawson whether he could remove Greiner from suicide watch, and Dawson confirmed that he could both times. (ECF No. 29-8 at PageID.271.) Dawson also advised that it was not necessary to assess Greiner every 24 hours unless he exhibited suicidal ideation or committed preparatory acts. (ECF No. 29-17 at PageID.380.) In addition, Defendants were no longer required to monitor Greiner every 15 minutes, but would only be required to check

5

him every 30 minutes, along with the other general population inmates. (ECF No. 29-7 at PageID.255; ECF No. 29-18 at PageID.391.)

After Dawson determined that Greiner was not a suicide risk, he was moved to Cell 13B in the general population. Later that day, Deputy Fraass interviewed Greiner about the previous day's events. During the interview, Greiner did not mention trying to commit suicide or having suicidal thoughts.[2] (ECF No. 29-4 at PageID.216.)

### D.    The November 5 Incident

Defendants Padilla and Fritcher returned to the jail for their next shift on November 5 at 6:00 a.m. Defendant Padilla was the floor officer for the day and had primary responsibility for doing 30-minute-interval cell checks. (ECF No. 29-7 at PageID.256–57.) Both Defendants had minimal interaction with Greiner that morning. Defendant Padilla exchanged "good mornings" with Greiner during the morning meal pass, and Defendant Fritcher answered Greiner's inquiry about when he would be seen by the magistrate that day. (ECF No. 29-7 at PageID.257; ECF No. 29-8 at PageID.274.)

At 9:05 a.m., Defendant Padilla conducted a check via video feed. (*Id.* at PageID.257; ECF No. 29-20 at PageID.396.) At 9:15 a.m., Magistrate Gowell contacted Defendants about conducting an arraignment for prisoner Hallack, who was currently on suicide watch, via polycom video. The arraignment took about 20 minutes to complete. (ECF No. 29-8 at PageID.273.) Following the arraignment, Defendant Fritcher returned to the booking room, and Defendant Padilla conducted cell checks. At 9:38 a.m., Defendant Padilla radioed Defendant Fritcher for help in Cell 13B after he found Greiner hanging with a phone cord around his neck. Defendant Fritcher

---

[2] Defendants have submitted an audio recording of Deputy Fraass's interview of Greiner. (ECF No. 29-18.) The recording confirms that Greiner did not mention present suicidal thoughts or his statements during the incident the preceding day.

responded from the booking office within seconds. (ECF No. 29-7 at PageID.258.) Defendants then lifted Greiner up and unwrapped the phone cord, and Defendant Fritcher administered CPR. (*Id.* at PageID.259.) EMS was contacted and arrived on the scene by 9:46 a.m. (*Id.*; ECF No. 29-20 at PageID.396.)

Greiner was subsequently taken to Mercy Hospital, where he remained until November 16, 2018, when he was pronounced dead. An autopsy was performed, concluding that the cause of death was near hanging at OCJ. (ECF No. 29-22 at PageID.401.)

## II.  Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III.  Discussion

### A.  Fourth Amendment Claim

As an initial matter, Plaintiff's attempt to assert a Fourth Amendment claim should be rejected for several reasons. First, Plaintiff never alleged a Fourth Amendment claim in his complaint, and "a party is not entitled to amend his pleading through statements in his brief." *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F. Supp. 518, 526 (S.D.N.Y. 1977) (citing *Chambliss v. Coca-Cola Bottling Corp.*, 274 F. Supp. 401, 409 (E.D. Tenn. 1967), *aff'd* 414 F.2d

7

256 (6th Cir. 1969)). Second, the Court has previously concluded that because Greiner was a pretrial detainee, his claim is governed by the deliberate indifference standard under the Fourteenth Amendment. (ECF No. 4 at PageID.35–36.) Finally, subsequent to the Court's initial screening opinion, the Sixth Circuit has continued to affirm that the deliberate-indifference standard is applicable in cases such as this.[3] *See Troutman v. Louisville Metro Dep't of Corrs.*, 979 F.3d 472, 482 (6th Cir. 2020); *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 600 (6th Cir. 2020).

Accordingly, Plaintiff's claim should be analyzed under the deliberate-indifference standard.

### B.    Fourteenth Amendment Claim

Defendants argue that they are entitled to qualified immunity because they did not violate Greiner's clearly established constitutional rights of which a reasonable officer would have known. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts

---

[3] Judges of this Court continue to recognize that the Sixth Circuit has not extended *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), to conditions-of-confinement claims and that the deliberate-indifference standard applies to a pretrial detainee's claim that he was denied medical care. *See Thomas v. Nasser*, No. 1:20-cv-1186, 2021 WL 1960765, at *5–6 (W.D. Mich. May 17, 2021).

alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court considers the state of the law at the second step. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). "'[C]learly established law' may not be defined at such 'a high level of generality.'" *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "[A] plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Id.* (quoting *White*, 137 S. Ct. at 552). Stated differently, "[o]n both the facts and the law, specificity is [a court's] guiding light." *Novak v. City of Parma*, 932 F.3d 421, 426 (6th Cir. 2019).

The Fourteenth Amendment guarantees pretrial detainees the right to adequate medical care consistent with the standards governing provision of medical care to convicted prisoners under the Eighth Amendment. *Richko v. Wayne Cnty.*, 819 F.3d 907, 915 (6th Cir. 2016) (citing *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985)). The unnecessary and wanton infliction of pain

encompasses "deliberate indifference" to an inmate's "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976); *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001). A deliberate indifference claim has two components. First, the court must determine, objectively, whether the alleged deprivation was sufficiently serious. A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). Thus, the objective component is satisfied where a detainee receives no treatment for a serious medical need. *See Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). In the context of mental health, "[p]sychological needs may constitute such 'serious medical needs' particularly when those psychological needs 'result in suicidal tendencies.'" *Troutman*, 979 F.3d at 482 (quoting *Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)). While an inmate has no right to be screened correctly for suicidal tendencies, once a prisoner has been identified as suicidal, prison officials are obligated to provide him medical care. *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)).

If the plaintiff satisfies the objective component, he must then demonstrate that the defendant possessed a sufficiently culpable state of mind:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In other words, the plaintiff "must present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it.'" *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (citing *Farmer v. Brennan*, 511 U.S. at 829, 847). To satisfy this part of the analysis, the plaintiff must demonstrate that the defendant acted with "deliberateness

tantamount to intent to punish." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005). Because negligence will not suffice, *Perez v. Oakland Cnty.*, 466 F.3d 416, 431 (6th Cir. 2006), an "[a]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation," cannot support a claim of deliberate indifference, *Farmer*, 511 U.S. at 838.

Defendants do not contest that Plaintiff has established the objective prong of his claim, as OCJ staff identified Greiner as being at risk for suicide and placed him on suicide watch. The sole issue is whether Plaintiff has presented sufficient evidence to create a genuine issue of fact on the subjective prong. Initially, two observations are in order. First, although Plaintiff asserts that Defendants failed to follow various OCJ policies and protocols, a mere failure to comply with policies and protocols is not, by itself, sufficient to constitute deliberate indifference. *Stewart v. Warren Cnty. Bd. of Comm'rs*, 821 F. App'x 564, 570 (6th Cir. 2020); *see Nortley v. Mackie*, No. 1:16-cv-512, 2016 WL 3027202, at *2 (W.D. Mich. May 27, 2016) ("To the extent Plaintiff alleges a violation of MDOC policy, Defendants' alleged failure to comply with an administrative rule or policy does not itself rise to the level of a constitutional violation."). Second, Plaintiff must establish that each Defendant was deliberately indifferent. *Phillips*, 534 F.3d at 542.

To establish the subjective component in a case involving a prisoner suicide, the plaintiff must show that it was obvious that there was a "strong likelihood" the prisoner would commit suicide. *Downard*, 968 F.3d at 600 (quoting *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005)). The *Downard* court further elaborated on this requirement:

> "[I]t is not enough to establish that an official may have acted with deliberate indifference to some possibility of suicide, or even a likelihood of suicide; the test is a strong likelihood of suicide." *Galloway v. Anuszkiewicz*, 518 F. App'x 330, 336 (6th Cir. 2013); *see also Barber* [*v. City of Salem*], [953 F.2d 232,] at 239–40 [6th Cir. 1992)] (holding that a prison official must have "knowledge of a strong likelihood," not just a "mere possibility," that an inmate will attempt suicide); *Horn*

11

*v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660–61 (6th Cir. 1994) (same). This is a high bar and typically requires evidence that the inmate was already on suicide watch, previously attempted suicide under similar conditions, or recently expressed a desire to self-harm. *See Grabow v. County of Macomb*, 580 F. App'x 300, 309 (6th Cir. 2014) (collecting cases).

968 F.3d at 601.

### 1. Defendant Fritcher

Plaintiff fails to create a genuine issue of fact that Defendant Fritcher ignored a substantial risk of harm to Greiner. As set forth above, Plaintiff must demonstrate that Fritcher "had the subjective knowledge, at least at times, that [Greiner] posed a risk of suicide." *Perez*, 466 F.3d at 425.

Fritcher was on duty at the jail as the booking officer on November 3, 2018, when Lt. Hasty brought Greiner into the jail. Fritcher did not speak to Lt. Hasty about Greiner at that time, although he began to fill out the intake form, leaving most of it blank for the arresting officer—Deputy Fraass—to complete. Fritcher was not advised of the remaining details on the intake form because it was completed after his shift ended that day at 6:00 p.m., meaning that Deputy Fraass had not arrived at the jail by that time.[4] (ECF No. 29-8 at PageID.269, 276.) Fritcher first learned that

---

[4] Plaintiff asserts that Deputy Fraass explained to Defendants Padilla and Fritcher the reason why he marked "yes" to certain questions on the intake form. (ECF No. 35 at PageID.516.) Defendants Padilla and Fritcher both testified that they did not speak with the arresting officer about the intake form because they had left for the day when Deputy Fraass filled it out. (ECF No. 29-7 at PageID.252; ECF No. 29-8 at PageID.269.) Deputy Fraass did not testify that he spoke to Defendants Padilla and Fritcher. Instead, he said that he "probably" notified both the day shift and the night shift about the details of what had occurred, but he did not affirmatively state that he spoke with Defendants. Because Deputy Fraass's testimony is equivocal about whether he spoke with Defendants, and there is no evidence in the record suggesting that he actually did speak with them, his testimony does not suffice to create an issue of fact. *See Southern Tr. Ins. Co. v. Morgan*, 57 F. Supp. 3d 882, 888 (E.D. Tenn. 2014) (the defendant's testimony about what she would have said if asked a particular question too equivocal to create an issue of fact); *Martin v. Oakland Cnty.*, No. 06-CV-12602, 2008 WL 11355472, at *5 n.6 (E.D. Mich. Mar. 28, 2008) (testimony that a defendant may or may not have been present when the plaintiff was removed from his cell was insufficient to create an issue of fact).

Greiner had been deemed a suicide risk and thus placed on suicide watch when he reported for his next shift on November 4 at 6:00 a.m. Fritcher maintained a suicide watch log and kept Greiner on suicide watch until Dawson arrived to examine Greiner. Dawson concluded that Greiner was not currently at risk of suicide and advised that he could be taken off suicide watch. (ECF No. 29-17 at PageID.380.) Fritcher twice confirmed with Dawson that Greiner no longer needed to be on suicide watch. From the time Greiner was removed from suicide watch, at about 4:00 p.m. on November 4, until the next morning when he was found in his cell hanging by the phone cord, Greiner had not engaged in any behavior or given any indication of suicidal thoughts or acts suggesting that Dawson's opinion was no longer valid.

Because Dawson was a mental health professional, Fritcher was entitled to rely on his professional judgment and advice. *See McGaw v. Sevier Cnty.*, 715 F. App'x 495, 498 (6th Cir. 2017) ("Cases in this and other circuits demonstrate that a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he 'reasonably deferred to the medical professionals' opinions.'" (quoting *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006)); *Taylor v. Hillis*, No. 1:10-CV-94, 2014 WL 1464315, at *4 (W.D. Mich. Apr. 15, 2014) (corrections officer entitled to rely on the judgments of medical professionals regarding the appropriate course of treatment). This was particularly true because nothing had changed since Dawson had examined Greiner within the last 24 hours. *Cf. Perez*, 466 F.3d at 425 (concluding that the defendant was not entitled to rely on a November 8 assessment where "the situation did not remain stable between that date and the date [the defendant] assigned Perez to a single cell"). In short, a reasonable jury could not find that Fritcher had knowledge of a "strong likelihood" that Greiner would attempt suicide. *Downard*, 968 F.3d at 600.

13

Plaintiff contends that an issue of fact remains as to Defendant Fritcher for several reasons. First, he contends that Fritcher ignored or failed to consider readily available information that would have alerted him to a strong likelihood of suicide, including the information that Deputy Fraass reported on the intake form and the booking and medical assessments that Deputy Young prepared. As the Sixth Circuit has observed, however, a "bur[y] their heads in the sand" theory such as this requires a showing that the decedent "posed an obvious risk of suicide and that [the defendant] refused to verify underlying facts that [he] strongly suspected to be true." *Stewart*, 821 F. App'x at 571 (quoting *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015)). Here, in light of Dawson's recommendation, Plaintiff fails to show both that Greiner posed an "obvious" risk of suicide and that Fritcher refused to verify or ignored information that he suspected was true. As noted above, Fritcher became aware of Greiner's suicide-watch status when he reported for his shift on November 4 and continued him on that protocol until Dawson advised that it was no longer necessary. Nothing else occurred between Dawson's recommendation and the suicide attempt on November 5 that would have alerted Fritcher that Dawson's recommendation was off the mark.[5]

Moreover, the information Plaintiff says Fritcher ignored would not have shown what Plaintiff claims. While the intake form indicates that Greiner's behavior suggested suicidal tendencies—something Fritcher already knew from Greiner's placement on suicide watch—it does not disclose his "suicide-by-cop" threat or his pointing a crossbow at officers. Similarly, Deputy Young's medical assessment *does not* indicate, as Plaintiff asserts, that Greiner had contemplated suicide in connection with his recent mental health hospitalization. (ECF No. 35 at PageID.517.)

---

[5] Defendants have submitted video of Cell 13B depicting Greiner's activity in the cell between approximately 9:00 and 9:38 a.m. the morning of November 5. While informative, the video plays no part in my analysis of Defendants' subjective knowledge because it does not disclose any fact of which Defendants would have been aware that morning before facilitating the arraignment.

Rather, it states that Greiner had been at Hackley Hospital for psychiatric care, but he had never contemplated or attempted suicide, although the form indicates he was contemplating it at the time of intake (but before Dawson's assessment on November 4). (ECF No. 29-13 at PageID.328.)

Plaintiff also argues that a reasonable jury could conclude that Fritcher was deliberately indifferent based on his failure to follow Dawson's "safety plan" for Greiner, recommending, among other things, 30-minute cell checks and continuous video observation. (ECF No. 29-18 at PageID.391.)[6] But given Dawson's conclusion that Greiner was not a suicide risk and his explicit recommendation that Greiner could be removed from suicide watch, a reasonable officer would not have interpreted Dawson's suggestion as an indication that Greiner should be observed *as if he were* a suicide risk. A similar situation was presented in *Downard*. There, a mental health clinician found that the inmate was not a suicide risk and did not place him on suicide watch, but he recommended that the inmate remain in the booking area until the following Monday, when he would be reassessed. 968 F.3d at 598. Contrary to the clinician's recommendation, the defendant moved the inmate to a cell outside the booking area, where he later committed suicide. The court concluded that, given the clinician's opinion that the inmate was not suicidal, "the facts available to [the defendant] did not make it obvious that [the inmate] posed a 'strong likelihood' of suicide." *Id.* at 602. The same is true here.[7]

---

[6] Greiner was observed by video 33 minutes before he was discovered in his cell having attempted suicide. (ECF No. 29-7 at PageID.257; ECF No. 29-20 at PageID.396.)

[7] To the extent Plaintiff contends that, per Dawson's recommendations, Defendants were required to maintain continuous video monitoring of Greiner, the argument makes no sense given that OCJ's suicide watch protocol only required 15-minute observation, either directly or by camera. (ECF No. 29-12 at PageID.319.) A literal application of Dawson's recommendation would have required even more stringent monitoring than policy required of a prisoner who was deemed not to present a suicide risk.

Finally, Plaintiff's assertion that the instant case is strikingly similar to *Troutman*, *supra*, falls flat. In contrast to this case, the defendant in *Troutman* was aware of a host of facts indicating a "strong likelihood" that the inmate would attempt to commit suicide, including that: (1) the inmate attempted suicide in the booking area one day after he was brought to the jail; (2) placing the inmate in solitary confinement created a risk given the inmate's prior suicide attempt; (3) based on another prisoner's prior suicide in a barred solitary cell, placing the inmate in the barred solitary afforded him a means to commit suicide; (4) placing the inmate in a single barred cell without first obtaining approval was contrary to jail policy; (5) medical approval had not been received at the time the defendant placed the inmate in the cell; (6) the inmate's situation was not stable between the initial clearance from suicide watch on November 17 and the date of his suicide on November 24, as the inmate engaged in conduct suggestive of continuing mental health issues; and (7) the clearance that was initially given was to the general population, rather than solitary confinement. There is no similar fact here. Greiner did not have a previous suicide attempt at the jail, and Fritcher was not aware of any previous suicide attempt. Greiner also did not engage in any concerning behavior after Dawson cleared him from suicide watch. Moreover, Plaintiff presents no evidence that OCJ had ever experienced an incident of an inmate hanging himself with a phone cord in a general population cell, such that Fritcher disregarded an obvious risk to Greiner by placing him in a cell with a phone. Thus, *Troutman* is easily distinguished.

### 2. **Defendant Padilla**

The analysis of Defendant Padilla's subjective awareness is substantially the same as the analysis for Defendant Fritcher. He and Fritcher were advised of Greiner's risk of suicide at the same time when they arrived for their shifts on November 4. Furthermore, Padilla had the same information as Fritcher and was entitled to rely on Dawson's professional judgment. It thus cannot

be said that Padilla ignored "obvious [indications] that there was a 'strong likelihood' that [Greiner] would attempt suicide." *Troutman*, 979 F.3d at 483 (quoting *Gray*, 399 F.3d at 616).[8]

## IV. Conclusion

For the reasons set forth above, I recommend that the Court **grant** Defendants' motion for summary judgment (ECF No. 28) and dismiss Plaintiff's complaint with prejudice.

Dated: June 28, 2021                                         /s/ Sally J. Berens
                                                                                                         SALLY J. BERENS
                                                                                                         U.S. Magistrate Judge

## NOTICE TO PARTIES

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

---

[8] Having concluded that Plaintiff fails to establish a constitutional violation, I find it unnecessary to address the second prong of the qualified immunity analysis.